The opinion of the Court was delivered by
Dunkin, C. J.
When the report of the presiding Judge is considered, in connection with the first ground of appeal, this Court understands the charge to have been that, in any view which he took, or which the jury could legally take, of the evidence, the defendants were either guilty of the crime of murder or of no offence.
In Mr. Archbold’s Treatise on Criminal Law, it is said to be “ the duty of the Judge, in a case of homicide, to explain the law to the jury, leaving to them the exclusive decision as to the truth or falsehood of the facts proved.” Again, “ if there be any doubt as to the grade of the offence, it is the duty of the Court clearly to define the several grades of homicide, and leave it to the jury to find, from the evidence, of what particular grade the defendant is guilty. And it has been held to be error in the Court to omit to charge the jury fully on the legal effect of the evidence tending to determine the character or degree of the defendant’s guilt.” “But the *234 Court, in charging the jury on a trial for murder, cannot be required to suppose a state of facts of which there is no evidence.” See Archbold’s Crim. Pl. & Pr., p. 918, and notes with cases there cited.
If there, was no evidence in this cause which, if believed, would have warranted the jury in mitigating the offence of the prisoners to the crime of manslaughter, then the charge of the presiding Judge is obnoxious to no just exception. Such was manifestly his own deliberate conviction from the testimony. It becomes the duty of this Court, before passing judgment on this ground of appeal, to analyze so much of the evidence as is supposed to present a case of extenuation. The prisoners, a mother and her two sons, were near relatives of the deceased. Some irritation and ill-feeling had been for some time engendered between them, arising from causes detailed in the evidence. On the evening of the fatal catastrophe, 1 June, 1865, Nettles (the principal witness for the prosecution) stated, among other things, that he, with the deceased and Crowell, were in the negro street of the plantation; when they got to the plantation, deceased (James Kirkland) took a seat and said, Let us take a drink. About dark witness “ heard something like a lady’s dress rattle; looked round and saw Mrs. Kirkland with a club; she struck deceased: he was sitting down; they then clinched; he (witness) told Mrs. K. to desist; the rest of the prisoners then came up, &c.” “ The party came together after Mrs. Kirkland; after she and deceased had clinched, I asked her to let me talk to her.” “ Mrs. Kirkland and James Kirkland both fell together after the firing — were clinched.”
Crowell’s account is partly this: that “ he was about fifty yards off when he heard a voice — thought it was that of Powell Kirkland; next heard a female voice, less than a minute after; Powell could not have been more than fifteen or twenty steps off from the party; Mrs. Kirkland said, What did you beat my child for ?” Again: “ Mrs. Kirkland and James Kirk *235 land were on their feet, grasped together, and fell together.” In his examination-in-chief, he had said Powell Kirkland said, “ Gro for Jim Kirkland; the voice of the woman was the next thing he heard; then the sound of the scuffle and report of the gun; went back; saw Mrs. K. and J. K. in grips; witness released Mrs. Kirkland from the hold of Mr. Kirkland.”
Powell Kirkland (one of the prisoners) testified that he was employed-all day on 1st June, with his ox-cart; that on the dam, about six hundred yards from the house, he received a note from James Kirkland (the deceased) to meet him at sundown at the plantation; that he went to the plantation in the evening, accompanied a part of the way by the other prisoners and Duncan McRa; witness’s mother and himself went to the negro-quarter; he walked up with his mother to where James Kirkland was sitting with Nettles; Kirkland was sitting with a gun across his lap, and a bottle of whiskey between them; his mother walked up and spoke to him in a civil manner, which he returned abruptly; she then said “he had whipped her son a few days ago, and now sent for another to whip him. Deceased replied he had whipped him, and would whip him again; then got up with his gun in both hands; his mother then started up to him; then his gun fired ; she ran up to him and they closed; she called to Nettles to loose James Kirkland from her; witness attempted to shoot Kirkland; Nettles seized the gun; they scuffled, and fell over a stump; witness got away, and advanced towards James Kirkland, who was still hold of his mother; attempted to shoot him again, but missed, &c.” Next morning after the killing of James Kirkland, the prisoners, Powell Kirkland and McRa Kirkland, with Duncan McRa, started for the military post at Columbia, and surrendered themselves to the authorities.
Such are the portions of the testimony on which the counsel for the prisoners rely in support of the first ground of appeal. "What part of it the jury may have believed, and what *236 part they may bave discarded from their consideration as unworthy of credit, this Court may not inquire. It was exclusively for them to determine. But if the jury believed the witnesses, and inferred from their testimony that there was no preconcert to take the life of the deceased, that there was no preconcert or purpose to do him bodily harm, but that the prisoner, Margaret Kirkland, already irritated (with or without cause) against the deceased, and inflamed to anger by hearing that he had “frailed” one of her sons and had, that day, sent for another to whip him, determined to go to him, and, if he admitted the charge, chastise him with that " unruly member ” said to be “full of all evil, and which no man can tame,” and which her sex are said sometimes to use with singular severity and effect — that, being rendered more indignant by the manner in which she was met, a scuffle ensued — her sons interfered — and death followed — if the jury believed all this, (and the Court have no warrant for assuming that it may not have been believed,) they would have violated no rule of law, by reducing the offence of the prisoners to the crime of manslaughter. The Court is under painful misgivings that,- regarding the charge of the presiding Judge, the jury may not have considered themselves authorized to take this view of the transaction and find their verdict accordingly — that, in the eye of the law, as expounded by the Judge, the prisoners were guilty of “murder, or of no offence.” This Court is of opinion, that an additional alternative should have been presented for their consideration and decision. Under these circumstances, and responding to the humane wish of the presiding magistrate, as expressed in his report, this Court has determined that it is due to the administration of penal justice, to submit the case to the examination of another jury ; and the motion for a new trial is granted.
Wardlaw and Inglis, J. J., concurred.

Motion granted.